UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DR. CHINYERE ODELUGA,                    )
                                         )
                    Plaintiff,           )
                                         )   Case No. 12-cv-07388
            v.                           )
                                         )   Judge John W. Darrah
PCC COMMUNITY WELLNESS CENTER,           )
DR. JENNIFER ROSSATO,                    )
DR. PAUL LUNING, DR. ALEXANDER WU,       )
and DR. ANTOINETTE LULLO,                )
                                         )
                    Defendants.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Dr. Chinyere Odeluga brings this action against her former employer,

PCC Community Wellness Center ("PCC"), and Drs. Jennifer Rossato, Paul Luning,

Alexander Wu, and Antoinette Lullo (the "Individual Defendants").  Dr. Odeluga's Third

Amended Complaint alleges:  race discrimination against PCC, pursuant to Title VII; harassment

and hostile work environment against PCC, pursuant to Title VII; national origin discrimination

against the Individual Defendants, pursuant to 42 U.S.C. § 1981; and age discrimination against

PCC, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623.

Defendants have moved for summary judgment, and the matter has been fully briefed.

## LOCAL RULE 56.1

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the

advantage of the parties' familiarity with the record and often cannot afford to spend the time

combing the record to locate the relevant information,' in determining whether trial is

necessary."  *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation

omitted).  Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a

statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and, in the case of any disagreement, to specifically reference the "affidavits, parts of the record, and other supporting materials relied upon." *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Rule 56.1(b)(3)(C) further permits the nonmovant to submit additional statements of material facts that "require the denial of summary judgment."

A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 deems those facts admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (the district court has discretion to require strict compliance with its local rules governing summary judgment). Accordingly, to the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. Dr. Odeluga is a black, Nigerian-born female, over forty, who is now a citizen of the United States. (Def's R. 56.1 Stmt. of Material Facts ("SOF") ¶ 1.) PCC is an Illinois not-for-profit corporation and a federally-qualified community health center that operates eleven clinics on the west side and near-western

suburbs of Chicago.  (*Id.* ¶ 2.)  Dr. Jennifer Rossato is a family medicine physician who was

employed as an attending physician at PCC from 2008 to 2013.  (*Id.* ¶ 7.)  Dr. Paul Luning is a

family medicine physician and is currently PCC's Chief Medical Officer.  (*Id.* ¶ 3.)  Dr.

Alexander Wu is a family medicine physician and an employee of PCC.  (*Id.* ¶ 4.)  Dr. Tamajah

Gibson is a family medicine physician and an employee of PCC.  (*Id.* ¶ 5.)  Dr. Antoinette Lullo

is a family medicine physician and a former employee of PCC.  (*Id.* ¶ 6.)  Between 2010 and

2011, Dr. Wu, Dr. Gibson, and Dr. Lullo were the co-directors of PCC's Maternal Child Health

Fellowship Program.  (*Id.* ¶¶ 4-6.)

*PCC Maternal Child Health Fellowship Program*

PCC offers a twelve-month Maternal Child Health ("MCH") Fellowship Program,

beginning in late July of each year.  (*Id.* ¶ 19.)  The program is designed to help family medicine

physicians in providing direct clinical services to high-risk women and children.  (*Id.* ¶ 9.)  The

MCH Fellowship clinical training focuses on:  (1) women's health maintenance and family

planning; (2) prenatal risk reduction and community-based care; (3) family-centered birthing,

active labor management, and operative obstetrics and neonatology; and (4) follow-up care for

high-risk babies.  (*Id.* ¶ 10.)  MCH fellows must also participate in weekly didactic sessions and

complete a Best Practice Guide and research project.  (*Id.* ¶ 11.)  Training also includes a

requirement that fellows must manage the labor and delivery floor at the hospital.  (*Id.* ¶ 12.)

Fellows have various duties, including delivering babies (both vaginally and via C-Section),

assisting on-call residents, and working in one of PCC's outpatient clinics.  (*Id.* ¶¶ 14-15.)

Fellows can be evaluated by the attending physicians with whom they work.  (*Id.* ¶ 16.)

Evaluations can either be written, using a fellowship evaluation form, or oral.  (*Id.* ¶¶ 16-18.)  If

a fellow completes all of the requirements of the program, then PCC will provide the fellow with

3

a Certificate of Completion. (*Id.* ¶ 19.) Upon completion of the program, the fellow should be able to obtain Level 2 privileges at a hospital. (*Id.* ¶ 20.) Level 2 privileges mean that a physician is qualified to perform C-Sections and other obstetric procedures. (*Id.*)

*Dr. Odeluga's Employment as a MCH Fellow*

Dr. Odeluga applied to the MCH Fellowship in December of 2009 and was accepted into the 2010-2011 fellowship class. (*Id.* ¶ 21.) Dr. Odeluga's employment agreement with PCC stated that she would begin her fellowship on July 22, 2010, and end on July 25, 2011. (*Id.* ¶ 22.) PCC allowed Dr. Odeluga to delay her start date until October 1, 2010, because she gave birth in June of that year. (*Id.*; *see also* Pl.'s Stmt. of Additional Facts ("PSAF") ¶ 3.)

Not long after Dr. Odeluga commenced the fellowship, PCC co-directors began receiving complaints about her performance from attending physicians, nurses, and residents who worked with her in labor and delivery. (SOF ¶ 23.)[1] In order to address the complaints, the co-directors instituted a "Performance Improvement Plan" in November 2010. (*Id.*) The plan addressed five principle issues: Timeliness, Communication/Visibility, Vigilance, Decision Making, and Teaching. (*Id.*)

---

[1] As discussed more fully above, the non-movant's failure to comply with Local Rule 56.1(b)(3) deems the movant's stated facts admitted. Dr. Odeluga has failed to comply with the Rule's requirements with respect to many of her Rule 56.1(b)(3) responses. For example, in response to Defendants' SOF ¶ 23, Dr. Odeluga does not deny or admit that the PCC co-directors began receiving complaints about her performance or that she was placed on a performance improvement plan. Rather, she includes the extraneous statement that "In fact, Plaintiff [*sic*] personal copy of interactive DVD of Challenger cesarean delivery is what was used for teaching . . . ." and cites to her own affidavit. (Pl.'s Resp. to SOF ¶ 23.) Many similar examples of improper and argumentative responses are found throughout Dr. Odeluga's Rule 56.1(b)(3) statement. In their reply brief, Defendants request that the Court strike many of Dr. Odeluga's Rule 56.1(b)(3) response paragraphs, as well as her Statement of Additional Facts. (*See* Defs.' Reply Br. at 3-4.) The Court declines to strike Dr. Odeluga's filings but has deemed admitted those facts to which Dr. Odeluga has improperly responded. Likewise, where Dr. Odeluga has relied upon inadmissible hearsay or has otherwise failed to support her Statement of Additional Facts, the Court has disregarded those statements.

In January 2011, the co-directors met with Dr. Odeluga to assess her performance in light of the improvement plan. (*Id.* ¶ 24.) Evaluations from attending physicians indicated that Dr. Odeluga continued to be late to her duties at the hospital and at the outpatient clinic. (*Id.*) The evaluations also noted that Dr. Odeluga was slow in attending to patients, failed to notice when significant issues were arising, and had difficulty recognizing high-risk situations like high blood pressure, increasing magnesium levels, or prolonged low heart rate. (SOF ¶ 25.) The evaluations also pointed out problematic instances with Dr. Odeluga's performance in the operating room. (*Id.* ¶ 26.) They reflected that Dr. Odeluga was uncertain about length and depth of her incisions, had poor suturing technique, and "frequently" dropped needles in the operating field or left needle tips uncovered. (*Id.*) Additionally, the evaluations complained that Dr. Odeluga failed to "call out" the surgical instruments she needed, instead relying on the attending physicians to do so. (*Id.*) Finally, the evaluations pointed out that Dr. Odeluga failed to recognize tissue landmarks during surgery, including failure to "recognize the difference between the bladder and the uterus." (*Id.*) In concluding the performance review with Dr. Odeluga, the co-directors notified her that she needed to show significant progress by February 23, 2011 in order to be on track to graduate. (*Id.* ¶ 27.)

In March 2011, the co-directors again met with Dr. Odeluga to discuss her continuing performance issues. (*Id.* ¶ 28.) In a memo dated March 8, 2011, the co-directors reflect Dr. Odeluga's continued tardiness and her failure to recognize abnormal fetal heart rates. (*Id.* ¶¶ 28-30.) The memo mentions an example of when Dr. Odeluga "lacked urgency" in responding to a "persistent fetal bradycardia alarm on a laboring patient." (*Id.* ¶ 30.) The memo also cited instances of complaints from attending physicians that Dr. Odeluga failed to order the correct workup on a patient, had difficulty remembering basic obstetrical knowledge, and had trouble

managing multiple patients simultaneously.  (*Id.*)  The complaints also indicated that Dr. Odeluga became very defensive when the co-directors tried to question her about these examples.  (*Id.* ¶ 29.)

In April 2011, the co-directors created an academic probation program for Dr. Odeluga to address Timeliness, Communication/Visibility, Vigilance, Clinical Decision Making, Teaching, OR Skills, and Faculty Evaluations.  (*Id.* ¶ 31.)  At that time, Dr. Odeluga was informed that failure to comply with the academic probation program would result in immediate termination from the MCH Fellowship.  (*Id.*)

In May 2011, the co-directors met to review Dr. Odeluga's performance under the academic probation program.  (*Id.* ¶ 32.)  The evaluations continued to raise concerns about Dr. Odeluga's performance.  (*Id.* ¶¶ 32-33.)  For example, Dr. Odeluga had fallen asleep in the middle of a patient exam.  (*Id.* ¶ 32.)  Another evaluation noted that she had fallen asleep in the back of a labor room, allowing a resident to deliver a baby unsupervised.  (*Id.*)  Still more evaluations showed that Dr. Odeluga had continued problems with prioritizing, seeing post-partum patients before seeing a high-risk patient in labor.  (*Id.* ¶ 33.)  The evaluations indicated that Dr. Odeluga failed to recognize when Pitocin was required for active labor management, was inefficient in directing activities in triage and labor and delivery, failed to review patients' history before procedures, gave Vicodin to a patient with a history of substance abuse, and provided incorrect histories on patients.  (*Id.*)  After their review of Dr. Odeluga's evaluations in May 2011, the co-directors decided that she was not meeting criteria for promotion as a Level 2 provider and would not be a candidate for graduation from the fellowship.  (*Id.* ¶ 34.)

On June 2, 2011, Dr. Paul Luning informed Dr. Odeluga that her participation in the fellowship had been terminated.  (*Id.* ¶ 35.)  Dr. Odeluga appealed her termination in a letter

dated June 21, 2011. (*Id.* ¶ 39.) Dr. Odeluga then met with Robert Urso, the Chief Executive

Officer of PCC. (*Id.*) After learning that Dr. Odeluga did not begin her employment until

October 1, 2010, despite the employment agreement's start date of July 22, 2010, Urso agreed to

reinstate her contract. (*Id.* ¶ 40.) Dr. Odeluga's contract termination date was extended from

July 25, 2011 until September 30, 2011, which was documented by an August 8, 2011 letter. (*Id.*

¶¶ 40-41.) The August 8, 2011 letter also stated that Dr. Odeluga was not on track to graduate

from the MCH Fellowship Program by the end of her contract term, meaning that no Certificate

of Completion could be provided. (*Id.* ¶ 42.)

*Dr. Jennifer Rossato*

Dr. Rossato did not work directly with Dr. Odeluga during her fellowship. (*Id.* ¶¶ 47-48.)

She did not work in the same PCC clinic as Dr. Odeluga. (*Id.* ¶ 48.) The majority of their

interactions occurred at West Suburban Medical Center. (Pl.'s Resp. to SOF ¶ 47.) Dr. Odeluga

testified that Dr. Rossato discriminated against her because she "nudged" her to hurry up and see

a patient whose fetal heart monitor was dropping. (SOF ¶ 49.) In a January 22, 2011 evaluation,

Dr. Rossato wrote that Dr. Odeluga failed to notice the dropping fetal heart rate and was slow to

respond when told to attend to the patient. (*Id.* ¶¶ 50-51.) In a February 7, 2011 evaluation, Dr.

Rossato noted that Dr. Odeluga was sleeping while a resident helped a patient labor. (*Id.* ¶ 52.)

In a May 7, 2011 evaluation, Dr. Rossato described a situation in which Dr. Odeluga had blood

and fluid on her shirt following a delivery, and failed to change it for hours while seeing other

patients. (*Id.* ¶ 53.)

*Dr. Alexander Wu*

Dr. Odeluga believes Dr. Wu discriminated against her in a number of ways. (*Id.* ¶¶ 54-

56; *see also* Pl.'s Resp. to SOF ¶¶ 54-56.) She testified that Dr. Wu discriminated against her

because he allowed another fellow to perform a C-Section on one of Dr. Odeluga's patients. (SOF ¶ 54.) Dr. Wu testified that, on that occasion, Dr. Odeluga did not recognize that the laboring patient required a C-Section, so he gave the surgery to the fellow who recognized the need for the procedure. (*Id.* ¶ 56; *see also* Pl.'s Resp. to SOF ¶ 56.) Dr. Odeluga also testified that Dr. Wu required her to obtain written evaluations from all of the attending physicians with whom she worked. (SOF ¶ 56.) Dr. Odeluga further testified that Dr. Wu discriminated against her because he would not make eye contact with her. (*Id.*; *see also* Pl.'s Resp. to SOF ¶ 54.) Finally, Dr. Odeluga testified that Dr. Wu discriminated against her because he told her, in an October 5, 2010 meeting, that "You Nigerians like to be overly ambitious. You people are greedy. The exam costs $5,000, don't take it. None of the Fellowship Co-Directors are certified in Family Practice Obstetrics." (SOF ¶ 55; *see also* Pl.'s Resp. to SOF ¶ 55.) Dr. Wu denies making those remarks. (*Id.*)

### Dr. Antoinette Lullo

Dr. Odeluga testified that Dr. Lullo discriminated against her by challenging statements she made during a presentation to other fellows in the program. (*Id.* ¶ 57; *see also* Pl.'s Resp. to SOF ¶ 57.) Dr. Odeluga believes that Dr. Lullo also discriminated against her by requiring her to obtain written evaluations from all of the attending physicians with whom she worked. (*Id.*) Finally, Dr. Odeluga testified that Dr. Lullo discriminated against her by giving Dr. Odeluga negative evaluations. (*Id.*)

### Dr. Paul Luning

Dr. Odeluga believes Dr. Luning discriminated against her when he "fail[ed] to protect her" when others criticized her. (*Id.* ¶ 58.) Dr. Odeluga states that Dr. Luning told her in October 2010 that "we have to keep an eye on you." (Pl.'s Resp. to SOF ¶ 58.) She also

believes that Dr. Luning discriminated against her because he gave her a satisfactory evaluation but then signed the letter terminating her from the fellowship.  (SOF ¶¶ 58-59.)

*The Other Fellows in the 2010-2011 MCH Program*

Dr. Odeluga testified that she believes all of the other fellows in the MCH fellowship were treated more favorably than her because they did not have to meet with the co-directors as often and because she had to obtain written evaluations from the attending physicians with whom she worked.  (*Id.* ¶ 60.)  She pointed to Dr. Mahnzas Ali, who began her fellowship at the same time as Dr. Odeluga in October 2010 and still received her Certificate of Completion.  (PSAF ¶ 2; *see also* SOF ¶ 62.)   Another fellow, Dr. Arturo Salazar, was allowed to remediate and complete 18 procedures to graduate.  (PSAF ¶ 12.)  This option was not given to Dr. Odeluga.  (*Id.*)  Dr. Odeluga acknowledged that none of the other fellows was placed on a performance improvement plan or academic probation.  (SOF ¶ 60.)

Dr. Odeluga also cites to the deposition testimony of Dr. Nathalie McCammon-Chase, a former employee of PCC.  (*Id.* ¶ 72.)  Dr. McCammon-Chase was not employed by PCC during Dr. Odeluga's fellowship in 2010-2011.  (*Id.* ¶ 74.)  She was involved in mentoring Dr. Odeluga after Dr. Odeluga was placed on the performance improvement plan and academic probation, but performed "no more than" three or four C-Sections with Dr. Odeluga.  (PSAF ¶ 5; SOF ¶ 74.)  Dr. McCammon-Chase testified that she believes Dr. Odeluga was not treated fairly by PCC because PCC allowed other fellows to graduate, in years past, who were "terrible."  (SOF ¶ 74.)  However, Dr. McCammon-Chase also testified that she is not aware of any other fellow in the 2010-2011 class who was treated more favorably than Dr. Odeluga.  (*Id.* ¶ 73.)  Dr. McCammon-Chase also testified that Dr. Odeluga had difficulty suturing and tying surgical knots and that she had to teach Dr. Odeluga how to do so.  (*Id.* ¶ 77.)  In a January 12, 2011 evaluation,

Dr. McCammon-Chase noted that Dr. Odeluga seemed to have a "different style of learning" and could benefit from more mentoring. (*Id.* ¶ 76).[2]

Dr. Odeluga believes that Dr. Erin Inglis, another fellow in the MCH program, performed a C-Section with attending physician Dr. Leah Suarez-Abraham during the fellowship in which the baby survived but the patient died. (*Id.* ¶ 63; *see also* Pl.'s Resp. to SOF ¶ 65). Dr. Suarez-Abraham denied ever participating in a C-Section with Dr. Inglis in which the patient later died, and believes Dr. Odeluga is referencing a surgery that occurred a year prior. (SOF ¶¶ 65-68).

*Graduation and the Certificate of Completion*

Dr. Odeluga did not complete her requirements for graduation by October 1, 2011, and was therefore not given a Certificate of Completion. (*Id.* ¶ 43.) On October 6, 2011, she wrote a letter to PCC asking them to provide her with a Certificate of Completion. (*Id.* ¶ 44.) On October 12, 2011, Urso replied to the letter and reiterated that Dr. Odeluga had not completed the fellowship requirements and thus would not receive a Certificate. (*Id.* ¶ 45.)

The MCH Fellowship Program does not have a formal graduation ceremony. (*Id.* ¶ 69.) The fellows receive their Certificates of Completion after turning in their final project, a Best Practice Guide ("BPG") on a topic approved by the co-directors. (*Id.* ¶¶ 69-70.) Dr. Odeluga's first BPG proposed topic of abstinence was not approved. (*Id.* ¶ 70.) Her second topic, the two-hour glucose tolerance test, was approved. (*Id.*) Defendants assert that Dr. Odeluga never turned in a BPG on her second topic. (SOF ¶ 70.)

_____

[2] As discussed in footnote one, the Court has disregarded Dr. Odeluga's Statement of Additional Facts to the extent that they rely upon inadmissible hearsay, including where Dr. Odeluga seeks to rely on Dr. McCammon-Chase's deposition testimony about what unidentified PCC doctors and staff said to Dr. McCammon-Chase about Dr. Odeluga. (*See, e.g.*, PSAF ¶ 7.)

There have been several fellows in the history of the MCH Fellowship who have not graduated or received their Certificate of Completion.  (*Id.* ¶ 79.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial."  *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)).  A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts.  *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted).  Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."  *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).  The court does not make credibility determinations or weigh conflicting evidence.  *Id.*

# ANALYSIS

A plaintiff may prove discrimination under Title VII, § 1981, and the ADEA through the direct or the indirect burden-shifting methods of proof. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal citations omitted). Under the direct method, the plaintiff must show, either through direct or circumstantial evidence, that her employer's unlawful discrimination caused her to suffer an adverse job action. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003). Direct evidence is rare and "essentially requires an admission by the decision-maker" of discrimination. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (internal citations and quotations omitted). Circumstantial evidence must be sufficient to create "a convincing mosaic of discrimination," which would permit a jury to infer intentional discrimination. *Adams*, 324 F.3d at 939 (internal citations and quotations omitted). Such a mosaic can be established through proof of "suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012). Where the plaintiff relies on circumstantial evidence, however, that evidence "must point directly to a discriminatory reason for the employer's action" and "be directly related to the employment decision." *Id.* (internal citations and quotations omitted).

Under the indirect method, known as the *McDonnell Douglas* test, a plaintiff may establish a *prima facie* case of discrimination through competent evidence that: (1) she belonged to a protected class; (2) she performed her job satisfactorily so as to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *Weber v.*

*Univs. Research Ass'n*, 621 F.3d 589, 593 (7th Cir. 2010); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). If the plaintiff satisfies this burden, the employer then has the burden to articulate a legitimate, nondiscriminatory reason for its decision. *Weber*, 621 F.3d at 593. The plaintiff may then challenge that reason as a pretext for discrimination. *Id.*; *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009).

Regardless of whether a plaintiff proceeds under the direct or indirect method of proof, the Seventh Circuit has observed that the fundamental question at the summary judgment stage is "whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013); *see also Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By now . . . the various tests that we insist lawyers use have lost their utility . . . . In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action . . . , and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason.").

*Direct Evidence of Race and National Origin Discrimination*

Dr. Odeluga argues that she has established a convincing mosaic of circumstantial evidence of discrimination on the basis of her race and national origin. She relies heavily on her testimony that Dr. Wu told her that Nigerians are "overly ambitious" and "greedy" in October 2010, during her first week of the MCH Fellowship.

"[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Merillat v.*

*Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (other internal citation omitted)).  Rather, for remarks to constitute direct evidence of discrimination, the remarks must be:  (1) made by the decision-maker; (2) close in time to the decision; and (3) related to the adverse employment action.  *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (citing *Hemsworth*, 476 F.3d at 491); *see also Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (in direct proof case, plaintiff must show that stray remarks were related to the employment decision at issue; "[i]f such proof is lacking, the remarks alone will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker") (internal citations omitted).

Even if Dr. Wu's stray remarks could be found to harbor racial animus, they do not meet two of the three elements required to constitute direct evidence of discrimination.  PCC concedes that Dr. Wu, as one of the three MCH co-directors, was a decision-maker.  However, Dr. Odeluga has failed to show that his comments were linked to an adverse employment decision and were made close in time to that decision.  Dr. Odeluga argues that Dr. Wu approved the June 2011 notice of termination.  However, as discussed further below, the June 2011 notice of termination was not an adverse employment action because Dr. Odeluga was reinstated and permitted to complete the entire term of the MCH Fellowship.  Furthermore, the June 2011 termination was nearly eight months after Dr. Wu's alleged remarks, and Dr. Odeluga has presented no evidence that the two were related.  *See, e.g., Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (collecting cases and finding a gap of three months insufficient to create a reasonable inference of discrimination).

Dr. Odeluga relies on the case *Hasan v. Foley & Lardiner LLP*, 552 F.3d 520 (7th Cir. 2008), to argue that Dr. Wu's comments present compelling circumstantial evidence of

discrimination. *Hasan* involved a dramatically different scenario than the present case. In that case, the plaintiff, a Muslim attorney of Indian descent, sued his former employer, a law firm, for discrimination. The plaintiff presented evidence that on the day of the terrorist attacks of September 11, 2001, one of the law firm partners said, in reference to Muslims, "those people don't belong here . . . they should kick them all out." *Id.* at 523. After September 11, the plaintiff began experiencing a decline in his workload and also began receiving more negative evaluations, culminating in his termination a year later. *Id.*

The district court granted summary judgment in the employer's favor, finding in part, that the comments were not close enough in time to the plaintiff's firing. The Seventh Circuit reversed and explained that the recency of the comments alone should not be a decisive factor. Rather, the recency of the comments should be viewed "together with who made the comments and how extreme those comments were" as to whether there was "a total picture of discrimination." *Id.* at 528. The court further noted that the negative comments were made around the time that the law firm began to steer work away from the plaintiff, which ultimately lead to his termination. *Id.* After discussing additional circumstantial evidence that the plaintiff had presented, the Seventh Circuit held that there was a genuine issue of material fact whether the plaintiff provided sufficient circumstantial evidence of discrimination. *Id.* at 531.

As a preliminary matter, Dr. Wu's purported comments (which he denies making) are very different from the blatantly racist and inflammatory comments found in *Hasan*. Rather, Dr. Wu's alleged comments – which, unlike *Hasan*, are not corroborated by anyone except Dr. Odeluga – as stated, appear to be cautioning Dr. Odeluga against being too ambitious. Furthermore, in *Hasan*, the plaintiff had received good evaluations prior to September 11 and then began to receive negative evaluations after the comments were made. Dr. Wu's comments

are not related to a negative change in Dr. Odeluga's workload or evaluations. Instead, as

Dr. Odeluga herself observes, Defendants "were receiving complaints about Dr. Odeluga's

performance as soon as she started." (Pl.'s Resp. Br. at 11.) Simply put, Dr. Wu's stray

comments clearly do not create "a total picture of discrimination."

Dr. Odeluga has failed to present any direct evidence of discrimination based on race or

national origin.

*Indirect Discrimination Based on Race and National Origin*

Since she cannot prevail under the direct method, Dr. Odeluga must establish all four

element of a *prima facie* case of national origin discrimination under the indirect method of

proof. *See Weber*, 621 F.3d at 593. It is undisputed that Dr. Odeluga has satisfied the first

*McDonnell Douglas* element because she is of Nigerian descent. As for the second, third, and

fourth elements, Dr. Odeluga lacks evidence to overcome summary judgment.

Performing to PCC's Legitimate Expectations

With respect to the second element, Dr. Odeluga must establish that she was performing

well enough to meet legitimate expectations of her employer, PCC. It is undisputed that many

physicians, nurses and residents at the hospital complained to the co-directors of the

MCH Fellowship about Dr. Odeluga as soon as she began her fellowship. Defendants assert that

Dr. Odeluga repetitively demonstrated tardiness, poor decision-making, inattention to detail, lack

of urgency, lack of knowledge about basic obstetrics terms, and poor operating technique. (SOF

¶¶ 23-27.) For example, Dr. Rossato testified about a time when she found Dr. Odeluga sleeping

in the back of the delivery room while a resident, essentially unsupervised, helped a woman in

labor. As a result, Dr. Odeluga was placed on a performance improvement plan on

November 24, 2010. Dr. Odeluga's performance did not improve, and on April 6, 2011, she was

placed on an academic probation program. She also failed to meet its requirements. On May 25, 2011, the fellowship co-directors concluded that Dr. Odeluga was "not meeting criteria for promotion to function as a Level 2 provider. She is not a candidate for graduation from the MCH Fellowship." (SOF ¶ 34.)

Dr. Odeluga does not dispute that she received poor evaluations or that she failed to meet the requirements of the performance improvement plan and academic probation. Rather, she argues that she was judged unfairly because the attending physicians did not know she started in October 2010, instead of her original start date of July 2010. Dr. Odeluga's late start date is clearly irrelevant to the types of problems described by Defendants and mentioned above, including that she was repeatedly tardy, fell asleep, and lacked professional skills, including being defensive when confronted about problems. Furthermore, Dr. Odeluga failed to correct the problems when she was placed on an improvement plan and academic probation. *See Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 328 (7th Cir. 2002) (affirming grant of summary judgment in employer's favor where employee was repeatedly warned her job performance was unacceptable and failed to correct deficiencies, despite being given opportunities to do so); *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) ("our analysis of an employer's legitimate expectations does not merely consider whether a plaintiff's actual job performance was satisfactory – it is a much broader analysis, which allows fact-finders to consider factors such as insubordination and workplace camaraderie.").

Dr. Odeluga also relies on the deposition testimony of Dr. McCammon-Chase, who worked with Dr. Odeluga after Dr. Odeluga was placed on the performance improvement plan and academic probation. Dr. McCammon-Chase's testimony does not create a genuine issue of material fact. Rather, Dr. McCammon-Chase's testimony cuts both ways; she testified that

Dr. Odeluga did a good job assisting her with the call but also that Dr. Odeluga had trouble suturing and could benefit from more mentoring.  The fact that Dr. McCammon-Chase viewed Dr. Odeluga as having some skills does not overcome the undisputed evidence that Dr. Odeluga failed to meet PCC's expectations.  *See Peele,* 288 F.3d at 329 ("general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated."); *Zayas*, 740 F.3d at 1158 ( "[t]he question is not whether [plaintiff] *ever* satisfied the [employer's] expectations, but whether she met the [employer's] expectations *at the time she was fired*." (emphasis in original)); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . .  give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance.").

Because Dr. Odeluga has failed to demonstrate that she was meeting PCC's legitimate performance expectations, she cannot establish a *prima facie* case of discrimination.

<u>Adverse Employment Action</u>

Even if Dr. Odeluga could demonstrate that she was meeting PCC's legitimate performance expectations, she has failed to show that she suffered an adverse employment action.  An adverse employment action is "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits."  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).  It is "something more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Id.* (internal quotations and citations omitted).  Negative performance evaluations alone cannot constitute adverse action.  *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996).

Dr. Odeluga acknowledges that PCC reversed the June 2011 termination notice and permitted her to complete the full twelve-month term in the MCH Fellowship.  Consequently, the June 2011 termination notice does not constitute an adverse action.  Rather, Dr. Odeluga argues that she suffered an adverse employment action because she was treated differently than other fellows by being placed on the improvement plan and academic probation and because, on one instance, Dr. Lullo failed to make eye contact with her.  She also appears to argue that she should have received a Certificate of Completion at the conclusion of the MCH Fellowship.

"[N]ot everything that makes an employee unhappy is an actionable adverse action." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (internal quotations omitted). "Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  *Id.*  The fact that Dr. Odeluga was being monitored and required to improve her performance does not establish that she suffered an adverse employment action.  Likewise, that Dr. Lullo allegedly avoided making eye contact does not show an adverse action.

Furthermore, as discussed in this Court's February 26, 2014 Opinion, the Certificate of Completion was not a term or condition of Dr. Odeluga's employment.  There is no mention of the Certificate in Dr. Odeluga's Employment Agreement with PCC and no mention of it in the description of the MCH Fellowship that was attached to the Employment Agreement.  (*See* Dkt. No. 70, at 6.)  Defendants have presented evidence that other fellows in the MCH Fellowship history have not graduated or received Certificates, and this further corroborates that the

Certificate is not a term or condition of employment. (SOF ¶ 71.) Consequently, PCC's decision not to award Dr. Odeluga a Certificate is not an adverse employment action.

Dr. Odeluga has presented no evidence that she suffered an adverse employment action and has not established a *prima facie* case of discrimination.

<u>Similarly Situated Employees</u>

Finally, with respect to the fourth element, Dr. Odeluga has not shown that she was treated less favorably than other similarly situated fellows in the 2010-2011 class. A similarly situated employee "must be directly comparable to the plaintiff in all material respects." *Coleman*, 667 F.3d at 846 (internal quotations and citations omitted). The purpose of this requirement is "to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable' – discriminatory animus." *Id.* (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Dr. Odeluga contends that she was treated less favorably because she had to meet with the MCH Fellowship co-directors more often than the other fellows and because she had to obtain written evaluations from attending physicians. However, Dr. Odeluga was required to take those extra steps because she was placed on the performance improvement plan and academic probation. By Dr. Odeluga's own admission, the other fellows were not placed on a performance improvement plan or academic probation and therefore, were not similarly situated to Dr. Odeluga. Dr. Odeluga has failed to establish a *prima facie* case of discrimination based on her race and national origin, and therefore, this claim fails as a matter of law.

## Legitimate Non-Discriminatory Reason

Furthermore, even if Dr. Odeluga could meet her burden of establishing a *prima facie* case of discrimination, PCC has provided a legitimate non-discriminatory reason for refusing to issue her a Certificate of Completion. The evidence presented by Defendants establishes that PCC refused to issue a Certificate based on Dr. Odeluga's poor performance. Dr. Odeluga also failed to complete a Best Practice Guide, which was a requirement to graduate from the MCH Fellowship.

Under the burden-shifting analysis, Dr. Odeluga must show this reason was pretextual. "[A] party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie – not just an error, oddity, or oversight.'" *Teruggi v. CIT Group/Capital Fin.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010)). Dr. Odeluga has failed to put forth any evidence that would rebut PCC's non-discriminatory reason. Therefore, Defendants are entitled to summary judgment on Dr. Odeluga's race and national origin discrimination claim.

### *Dr. Odeluga's Age Discrimination Claim against PCC*

Dr. Odeluga has also asserted a claim for age discrimination in violation of the ADEA against PCC. The same standard articulated above for Dr. Odeluga's race and national origin discrimination claims applies to Dr. Odeluga's age discrimination claim. *See, e.g., Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2002) (addressing both Title VII and the ADEA claims of discrimination). Consequently, to prevail on her ADEA claim, Dr. Odeluga must either present direct evidence of age discrimination or by indirectly establishing age discrimination through the *McDonnell Douglas* burden-shifting approach, discussed above. *Id.*

In her response brief, Dr. Odeluga contends that Dr. Rossato asked her how old she was, told Dr. Odeluga that she was "too confident" during an overnight call, and filed excessive evaluations. (Pl.'s Resp. at 10.) Dr. Odeluga has not cited to any evidence to support these statements, and she does not assert them in her Statement of Additional Facts. Dr. Odeluga has presented no direct evidence of age discrimination by PCC.

Dr. Odeluga's age discrimination claim also fails under the indirect method, for the same reasons that her national origin and race discrimination claims fail. She meets the first element of being a member of a protected class because she was over forty years of age at the time she entered into the MCH Fellowship Program. However, as discussed above, Dr. Odeluga cannot establish that she was meeting PCC's legitimate expectations, suffered an adverse employment action, or that a similarly situated employee not in a protected class was treated more favorably than she was. Dr. Odeluga points to Drs. Ali, Salazar, and Inglis as younger, similarly situated employees. However, again, those doctors had different performance histories than Dr. Odeluga; they were not placed on improvement plans or academic probation and therefore, are not similarly situated. Dr. Odeluga cannot establish a claim for age discrimination against PCC, and therefore, summary judgment is granted in PCC's favor.

*Harassment and Hostile Work Environment*

Dr. Odeluga has also asserted a harassment and hostile work environment claim against PCC. A work environment violates Title VII when it "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). To establish a *prima facie* case for hostile

work environment, the plaintiff must show that:  "(1) the work environment must have been both subjectively and objectively offensive; (2) her [race, national origin or age] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability."  *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014) (affirming summary judgment in favor of employer) (internal citation omitted).  In determining whether a work environment is "objectively offensive," courts will consider a number of factors, including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Hilt-Dyson v. Chicago*, 282 F.3d 456, 463 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

In support of her claim, Dr. Odeluga points to her testimony that Dr. Wu would not listen to her, avoided eye contact with her, and, on one occasion, allowed another fellow, Dr. Inglis, to perform a C-Section on a patient that Dr. Odeluga had been treating.  She also points to her testimony that Dr. Rossato shouted at her to hurry up and "nudged" her to check on a fetal heart monitor on a patient whose fetal heart tones were dropping.  Dr. Odeluga also testified that Dr. Luning failed to "protect her" when others criticized her.  None of these claims supports that Dr. Odeluga's workplace was abusive.  These examples are not subjectively or objectively offensive and furthermore, do not relate to Dr. Odeluga's race, national origin or age.  Likewise, the cited conduct is not severe or pervasive.  There is no genuine issue of material fact as to Dr. Odeluga's hostile work environment claim.  Consequently, summary judgment is granted in PCC's favor.

**CONCLUSION**

For the reasons stated above, the Defendants' Motion for Summary Judgment [87] is granted. Civil case is terminated.

Date:   April 1, 2015                   　　　_____
　　　　　　　　　　　　　　　　　　　JOHN W. DARRAH
　　　　　　　　　　　　　　　　　United States District Court Judge